UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | | |
|---|---|---|
| NEW YORK MEDSCAN LLC and KAROLYN KERR, M.D., | : | Index No. 05 Civ.4653 (DC) ECF |
| | : | |
| Plaintiffs, | : | COMPLAINT |
| | : | |
| - against - | : | |
| | : | |
| CARECORE NATIONAL, LLC, CARECORE MANAGEMENT SERVICES, INC., | : | |
| NEW YORK UNIVERSITY SCHOOL OF MEDICINE, | : | |
| ANDREW W. LITT, M.D., | : | |
| NEW YORK MEDICAL IMAGING IPA, INC., NYMI IPA-O, LLC, and | : | |
| NYMI IPA-M, LLC, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------x

Plaintiffs, by their undersigned attorneys, Kaplan, Thomashower & Landau LLP, and Weiss, Zarett and Hirshfeld, P.C., bring this civil action against the defendants named herein and allege as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action under Section 4 of Clayton Act 15 U.S.C. §15 to recover treble damages and the costs of suit, including reasonable attorneys fees, against defendants for the injuries sustained by the plaintiffs in their business and property by reason of defendants' violations as hereinafter alleged of the antitrust laws, and, more particularly, Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act.  This Court has jurisdiction over the subject matter and the parties pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337.

2.      Venue is appropriate in this Court pursuant to 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 in that each defendant named herein is found, transacts business, has an agent or maintains an office within this district, the claims arose in this district, and the individual

defendant directly or indirectly performed acts within this judicial district in furtherance of the conspiracies alleged herein.

## THE PARTIES

3.       Plaintiff, Karolyn Kerr, M.D. ("Kerr") is a highly trained physician-radiologist licensed by the State of New York.  Dr. Kerr received her undergraduate degree from the University of Virginia and her medical degree from Boston University School of Medicine. Dr. Kerr is Board-certified in radiology and nuclear medicine, and has specialized in interpreting diagnostic imaging scans used to detect health conditions in the human body.

4.       Plaintiff New York Medscan, LLC ("Medscan") is a Delaware limited liability company having its principal office at 751 Second Avenue, New York, New York 10017.  Medscan was formed in 2001 and is in the business of providing state-of-the-art diagnostic imaging technology facilities and practice management services for physicians who diagnose a variety of forms of cancer and other human diseases and abnormalities.  The vast majority of patients having diagnostic scans at Medscan are being treated for cancer.

5.       Defendant CareCore National LLC is a New York limited liability company ("CCN").  CCN has a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  CCN was founded and is controlled and managed by practicing Board-certified radiologists, who themselves own and operate their own independent outpatient diagnostic imaging businesses approved by CCN and from which they independently profit.  As such, the radiologists on CCN's Board are competitors of Kerr.  The CCN Board radiologists provide, and authorize other radiologists to provide, outpatient and in-office diagnostic imaging services (hereinafter "outpatient diagnostic imaging services"), which will be paid through exclusive contracts between CCN and major private health benefit plans, such as Oxford Health Plans, Inc.  Upon information and belief, CCN, through various contracts, combinations and agreements, seeks to restrict and has unlawfully restricted the practice of radiology for outpatient diagnostic imaging services to a limited number of  radiologists and scanning facilities which are

2

approved by CCN for the provision of outpatient diagnostic imaging services. Such restriction also severely limits the ability of referring physicians to choose a radiologist for patients who are subscribers of major private health benefit plans under contracts with CCN.

6.     Upon information and belief, defendant CCN is operated and controlled by a majority of its Board who are competitors with each other and with the radiologists and facilities they determine to authorize or refuse, thereby controlling competition in the market for the benefit of their individual personal stakes and interests, respectively, and separate from CCN. These competing CCN Board members include at least the following:

    a.     Dr. Joel Canter, a practicing radiologist and competing provider, and the president of a competing facility, Imaging on Call;

    b.     Dr. Andrew Litt, a practicing radiologist, chairman of CCN and employed and paid by defendant New York University, a competing provider;

    c.     Dr. Derace L. Schaeffer, a radiologist and competing provider, employed by and a director of several companies which are competing facilities or providers; and

    d.     Dr. William G. Wolff, a practicing radiologist, chairman of the radiology department at New York Hospital at Queens, and an executive of Main Street Radiology, which are competing providers and facilities.

Other members of the CCN Board have combined and conspired with the above-named CCN Board members to further their independent stake and interests to the detriment of free and open competition in the market for providing diagnostic imaging services for patient-subscribers of private health benefit plans, sometimes referred to as "covered lives".

7.     Defendant CareCore Management Services, Inc. ("CMS") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls,

3

New York.  Upon information and belief, CMS has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein.

8.     Defendant New York Medical Imaging IPA, Inc. ("NYMI IPA") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590.  Upon information and belief, NYMI IPA has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein.

9.     Defendant NYMI IPA-O, LLC ("NYMI IPA-O") is a New York limited liability corporation with a principal place of business at 66 Middlebush Road, Wappingers Falls, New York 12590.  Upon information and belief, NYMI IPA-O has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein.

10.     Defendant NYMI IPA-M, LLC ("NYMI IPA-M") is a New York limited liability corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590.  Upon information and belief, NYMI IPA-M has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein.

11.     CCN, CMS, NYMI IPA, NYMI IPA-O and NYMI IPA-M are separate entities which upon information and belief participated as co-conspirators in the offenses alleged herein, and are referred to hereinafter collectively as "CCN" when the context so requires.

12.     CCN has entered into multiple and exclusive contracts and agreements with major private health benefit plans, and thereby controls diagnostic imaging services provided to the plans' subscribers, numbering in the millions.  Upon information and belief, CCN's share of the market for benefit plans' diagnostic imaging services has increased since 1995. and CCN is now the dominant supplier of such services for private benefit plans in the states of New York, New Jersey and in New York City in particular.  Upon information and belief, through multiple exclusive long-term contracts with private benefit plans, CCN controls a dominant portion of the market for outpatient diagnostic imaging scans for such plan-covered lives in New York City.

4

13.     Defendant Andrew W. Litt, M.D. ("Litt"), is the chairman of defendant CCN.  Dr. Litt simultaneously serves as a professor of radiology at defendant New York University School of Medicine and is a neuroradiologist with clinical responsibility at NYU Medical Center and Bellevue Hospital Center.  Through his position as chairman and a controlling member of the CCN Board of Directors, Dr. Litt, directly and in combination and conspiracy with other members of the CCN Board, a majority of whom are also competing radiologists, has obtained the power to see to the approval or removal of CCN-approved facilities and radiologists, such as Dr. Kerr, who are or would be competitors of NYU radiologists and other radiologists on the CCN Board having their own independent CCN-approved practices.

14.     Dr. Litt, in his position with the NYU School of Medicine, is also Vice Chairman of Financial Affairs at the NYU Department of Radiology, and is in charge of the financial affairs of NYU's Radiology Faculty Practice Plan ("RFPP"), which includes radiologists practicing at the NYU School of Medicine.  Upon information and belief, by reason of his employment and affiliation with NYU, Dr. Litt receives compensation and bonuses based on dollar volume from the services provided by himself and other radiologists in the NYU RFPP including services of interpreting diagnostic imaging scans for patients pre-approved by CCN for imaging and payment.  Dr. Litt obtains a direct financial benefit, through his positions at NYU and in the NYU RFPP, from providing diagnostic imaging services.  As such, Dr. Litt, in his role as a CCN Board member and in conspiracy with the other Board members and other defendants, has directly controlled and thereby eliminated competition with NYU radiologists and CCN-approved radiologists in the market for outpatient diagnostic imaging as hereinafter described.  At all times relevant, Dr. Litt has been employed and paid by NYU and has been employed by and on the Board of CCN and has had an independent personal stake in furthering the unlawful acts alleged herein.

15.     Defendant New York University School of Medicine is an administrative unit of New York University, a New York corporation with a principal office at 525 First Avenue, New York, New York 10016 ("NYU").  Certain physician radiologists of NYU, including defendant Dr. Litt, are employed by NYU to conduct a practice including being paid for interpreting outpatient diagnostic imaging scans for patients pre-approved by CCN.  These radiologists are organized in whole or in part as part of NYU's RFPP, also controlled by Dr. Litt.  Upon information and belief, NYU itself receives a portion of the income of the RFPP through a "Deans Tax" imposed on RFPP revenue.  Therefore, NYU and its radiologists and Dr. Litt, are competitors of plaintiff Dr. Kerr, and each has an independent personal stake in furthering the unlawful acts alleged herein.

16.     Upon information and belief, various individuals and entities, both known and unknown to plaintiffs and not named as defendants in this Complaint, participated as co-conspirators with the named defendants in the offenses alleged herein and performed acts and made statements in furtherance thereof.  These unnamed individuals and entities include, without limitation, during the relevant times, certain of the corporate defendants' executives, board members, radiologists and employees.  Plaintiffs may seek to amend this Complaint to add additional defendants as appropriate.

## INTERSTATE TRADE AND COMMERCE INVOLVED

17.     Advances in medical technology have made available newer and more effective diagnostic imaging equipment and techniques.  Such diagnostic imaging includes Computerized Axial Tomography ("CAT" or "CT") scans and Positron Emission Tomography ("PET") scans and combined PET/CT scans.  PET scanning uses florodeoxyglucose ("FDG") to distinguish if there are any abnormal uptakes of glucose, which thereby identify cancerous growths and other disorders.  CT scanning is used to view the internal structure of the patient's body to pinpoint accuracy by x-rays which are measured by detectors in the scanner.  A computer then processes those measurements to produce pictures of the body's internal structure

and the location of abnormalities.  The newest diagnostic imaging technology, PET/CT scanning, integrates PET and CT technologies into a single device to examine metabolic and anatomic systems simultaneously.  The combination of the CT and PET technologies addresses the limitations of the individual modalities, which is the lack of spacial resolution with PET and the lack of functional resolution with CT.  PET/CT imaging is the fusion of these two techniques in a single scan providing the highest accuracy to locate abnormal tumors and identify if they are malignant.  This translates into earlier diagnoses, faster initiation of treatment, and avoidance of invasive exams or exploratory surgery.  Combined PET/CT scanning is used for diagnoses in the area of oncology and on an experimental basis for other abnormalities.

18.    PET/CT scanning assists referring physicians in making better and more informed decisions in diagnosing cancerous tumors, predicting therapeutic alternatives, pinpointing the best treatment approaches and monitoring patient progress.  Such PET/CT scans and interpretation are referred to herein as PET/CT outpatient diagnostic imaging services ("PET/CT services").

19.    Patients diagnosed with cancerous abnormalities need follow-up scans at regular intervals on the same scanning equipment to accurately compare and assess changes in the patient's scan results.

20.    Facilities to provide cost-effective, outpatient PET/CT diagnostic imaging services can involve comprehensive practice management, including the leasing or purchasing of the sophisticated medical equipment, leasing space appropriate for utilizing that equipment, including lead-lined walls, hiring qualified medical technicians, obtaining radioactive isotopes and contrasts injected or ingested by the patient being scanned, and related medical practice management, consulting and billing services.  Plaintiff Medscan operates one such facility.

21.    A typical PET/CT scan is billed to the patient's benefit plan by the radiologist for thousands of dollars.  Such charges encompass both charges to administer the scan and the radiologist's professional fee to interpret the scan for the referring physician.

7

Patients with health benefit plan coverage will have all or most of those charges paid for by the benefit plan directly or through a contractual administrator, such as defendant CCN, which controls the PET/CT services to the plan's subscribers through defendants' exclusive contracts with each plan.

22.     Medscan has invested millions of dollars in the state-of-the-art high-technology imaging scanners, technology, non-medical staff and out-patient facilities and associated equipment necessary to provide state-of-the-art diagnostic imaging services of patients via CT, PET and PET/CT methods.  This includes operating a state-of-the-art $2.3 Million GE Discovery LS scanner at Medscan's office at 751 Second Avenue in New York City. The scanning methodology provided by Medscan also includes use of radioactive isotopes which require technicians with special education and training, and specialized facilities, including lead-lined rooms.

23.     Since at least as early as March 2002, and prior to the unlawful acts alleged herein, plaintiff Medscan was a CCN-approved facility and therefore able to provide the technical component of PET/CT services to referring doctors whose patients were subscribers of benefit plans with which CCN had exclusive contracts.

24.     Outpatient diagnostic imaging services require the patient to travel to a diagnostic imaging facility having the expensive, high-technology medical equipment and technical personnel to perform a scan on the patient.  Patients will typically be referred for a PET/CT diagnostic imaging scan by their referring physician to a location geographically convenient to their work or residence.  Therefore, the market for such services is localized to the patient and referring physicians.  But for the unlawful acts alleged, this need for PET/CT scanning services should result in competition among local providers and facilities in localized areas within the States of New York and New Jersey, as well as within New York City and within specific neighborhoods of New York City.  However, in these areas CCN approves only selected radiologists and physicians which limits competition.

8

25.     Except to the extent that competition has been hindered, frustrated, and restrained by the defendants and their co-conspirators as herein set forth, managed care PET/CT outpatient diagnostic services controlled or provided by those radiologists approved by CCN are in substantial, direct competition with such services provided by non-CCN-approved providers, including plaintiffs.  Moreover, facilities capable of providing diagnostic imaging services which are not approved by CCN are in competition with facilities which are approved by CCN.

26.      PET/CT services approved or controlled by CCN and those in competition with CCN are offered in interstate commerce to patients traveling in interstate commerce, and at facilities located in numerous states, and utilizing medical equipment which travels in interstate commerce.

27.     Accordingly, the conduct of defendants and co-conspirators which forms the basis of this compliant directly and substantially affects the flow of interstate commerce.

## FACTS COMMON TO THE VIOLATIONS ALLEGED

28.     Upon information and belief, CCN has long term, exclusive contracts to provide diagnostic imaging services for all subscribers with the health benefit plans Oxford, Aetna, HIP, Group Health, Inc. ("GHI"), Horizon, Healthnet, Wellcare and New York Labor Health Alliance.  These benefit plans typically receive prepayments of premiums on behalf of their subscribers, which are then used to pay for health care services provided to the subscribers.  CCN describes itself as "the fastest growing radiology benefit management company in the county" and as "the nation's leading diagnostic imaging management company."  Upon information and belief, CCN, through the exclusive contracts with the major health benefit plans, controls a dominant share of the market and geographic submarkets for PET/CT services  in New York and New Jersey, and in New York City in particular.

29.     CCN's aforesaid exclusive contracts with this large number of major private health benefit plans encompass millions of plan subscribers, or "covered lives." Specifically, CCN controls delivery of PET/CT services to subscribers of such plans by selecting

radiologists and facilities which CCN's competing Board members choose to approve and excluding other qualified providers and facilities in order to limit competition.  Patient-subscribers who are members of the health plans which are under exclusive contracts with CCN must obtain their PET/CT services only through CCN-approved providers and facilities in order for the patient to obtain benefit plan reimbursement, which is artificially fixed and determined by CCN, rather than by open competition.

30.     Upon information and belief, pursuant to CCN's exclusive contracts with these major health benefit plans, subscribers of the plans who are referred by their physicians for PET/CT diagnostic imaging services must be precertified by CCN in order to have their diagnostic procedure fully reimbursed.  A condition for such pre-approval is that the subscriber-patients must have their imaging performed only at a CCN-approved facility, and must have their scans read and interpreted only by a CCN-approved radiologist.  CCN limits competition by determining which facilities and radiologists it will permit within its "approved" group and thereby controls both the facilities and radiologists allowed to compete.  Upon information and belief, CCN further requires radiologists to be approved at a specific facility, notwithstanding that the radiologist may have been previously approved by CCN at another CCN-approved facility.

31.     CCN is therefore a group of competitors with market power, who by horizontal agreement  and for their individual personal stakes, exclude other competitors and facilities from access to subscribers of benefit plans covering millions of lives, by multiple exclusive plan contracts with CCN and other agreements.

32.     CCN further provides that PET/CT services which it approves, at facilities approved by CCN and by radiologists approved by CCN, will be reimbursed only under a schedule of prices fixed and controlled by the competing radiologists who control CCN. Accordingly, there is no competition in pricing among CCN-approved providers and facilities

because the prices are fixed by agreement among the competing radiologists controlling the CCN Board as well as by agreement with the CCN-approved radiologists.

33.     By reason of its exclusive contracts, as hereinabove alleged, CCN controls PET/CT services for in excess of 22,000,000 subscribers or "covered lives"  and, upon information and belief, in excess of 3.5 million covered lives in New York City.  Upon information and belief, this represents a dominant share of the patient market in New York City for PET/CT services and an even greater share of the market of covered lives under private health benefit plans.

34.     By reason of CCN's dominant market control of covered lives, through the health benefit plans with which CCN has exclusive contracts, approval by CCN as a CCN-approved diagnostic imaging facility and approval by CCN as a CCN-approved radiologist is necessary for effective competition in this market and CCN is able to control price and competition in the market.  Plaintiffs and other would-be competitors cannot negotiate and contract directly with the health benefit plans under exclusive contracts with CCN .  Therefore, plaintiffs cannot compete with defendants and there is no price competition among CCN-approved radiologists for the professional fees for interpreting such scans.

35.     Moreover, since referring physicians prefer to refer their patients to an imaging facility that accommodates all their patients irrespective of their specific health plan, exclusion of plaintiffs from such a large share of the health plan patient market further injures plaintiffs by eliminating physician referrals even for patients not subject to CCN plan contracts.

36.     In or about March 1, 2002, plaintiff Medscan entered into a "turnkey administrative services and license agreement" with New York University School of Medicine (the "NYU Agreement").  The NYU Agreement was signed by defendant Dr. Litt on behalf of NYU School of Medicine.  The NYU Agreement had a term of three years and obligated Medscan to provide NYU with office facilities, equipment and services in order to allow NYU radiologists and Dr. Litt to conduct a practice of PET/CT outpatient diagnostic scanning at

Medscan's premises. This included Medscan's provision of administrative and non-professional operations of the office, provision of supplies and providing and maintaining expensive PET/CT scanning equipment for use by NYU radiologists and others, as well as providing non-professional support personnel and technicians who were employees of Medscan.

37.     NYU, through the control of its employee, Dr. Litt, who also served as chairman of the Board of CCN, obtained approval for other NYU radiologists to be approved CCN providers.  At or about this time, Medscan was also approved as a CCN facility and Dr. Litt and the NYU radiologists were therefore reimbursed for pre-certified scans performed at Medscan.

38.     Patients needing PET/CT services covered by benefit plans under contract with CCN were referred to Medscan.  Images of those patients' scans were then provided by Medscan to NYU radiologists for review and diagnosis and reports were made to the referring physicians.

39.     The NYU Agreement further provided that, while NYU could provide PET/CT scanning services at other locations which might be owned or leased directly by NYU, NYU could not, during the term of the NYU Agreement, enter into a similar turnkey arrangement with a non-affiliated NYU entity to provide PET scanning service at any location in Manhattan south of 57th Street, north of Canal Street and east of Fifth Avenue, with certain exceptions, such as if NYU failed to perform an average of 80 PET cases per month.  Under the terms of the Agreement, NYU was to pay Medscan $1,500 per scan for use of the office space, supplies, personnel and equipment.

40.     The NYU Agreement between Medscan and NYU continued until February 27, 2005, at which time it expired.  The NYU Agreement was not renewed because Medscan and Dr. Litt, on behalf of himself and NYU, could not agree on a fee for Medscan's services on a going forward basis for use of Medscan's facilities and equipment.

41.    Since July 2002, plaintiff Dr. Kerr was employed at Beth Israel Hospital in New York City ("Beth Israel") and was approved by CCN as a radiologist to be paid by CCN. Accordingly, there was no question that Dr. Kerr was fully qualified by CCN to interpret PET/CT scans.

42.    In November 2004, Medscan entered into a practice management services agreement with Kerr ("the Kerr Agreement") pursuant to which Medscan would provide Kerr with office space, medical and non-medical equipment and technicians. The Kerr Agreement was to commence at the conclusion of the NYU Agreement. Dr. Kerr would read and interpret PET/CT scans taken at Medscan. Since Dr. Kerr and Medscan were already CCN-approved providers and facilities, such services should have continued to be pre-approved and paid for on behalf of the patients covered by benefit plans with which CCN had exclusive contracts.

43.    In December 2004, Dr. Kerr moved to Medscan and she was approved by CCN as a radiologist to be paid for reviewing PET/CT scans at Medscan with the knowledge and consent of Dr. Litt, NYU and the NYU RFPP.

44.    In the period January to February 2005, defendant Litt was attempting to negotiate the renewal of the NYU Agreement. In an effort to compel Medscan to acquiesce to terms demanded by defendants Litt and NYU, Litt advised Medscan in words or in substance that he was in control of defendant CCN and its approval process and that if Medscan did not renew the NYU Agreement or enter into a new contract with NYU and defendant Litt on the terms they demanded, then Medscan and Kerr would lose their status as a CCN-approved facility and a CCN-approved radiologist. In this connection, Dr. Litt advised Medscan executives in words or in substance "I am CareCore" and threatened Medscan "how are you going to do this business without me?" Medscan did not renew the NYU Agreement or enter a new agreement with NYU on the new terms demanded by Dr. Litt and the NYU Agreement terminated.

45.    During this time, Dr. Litt also attempted to engage Dr. Kerr to work for NYU, which Dr. Kerr declined. In view of the termination of the NYU Agreement and Dr.

Kerr's refusal to work for NYU, Dr. Litt and other defendants combined and conspired to eliminate plaintiffs as competitors.

46.     After termination of the NYU Agreement between NYU and Medscan, Dr. Litt, as he had previously threatened to do, arranged for CCN to terminate plaintiffs as CCN-approved providers and facilities, so as to eliminate the only viable competition with himself and the NYU radiologists as CCN-approved physicians.  Thereafter, as a result of defendants' actions targeted against Medscan and Dr. Kerr, CCN refused to pre-certify patients referred to Medscan or to reimburse plaintiffs for PET/CT services provided by Dr. Kerr at Medscan for covered lives of plans under contract with CCN, notwithstanding that both Medscan and Dr. Kerr had both previously been CCN-approved to provide such services.  Accordingly, the actions taken pursuant to the conspiracy alleged herein were entirely unrelated to the quality of patient care but were solely with the intent and effect of eliminating competition and retaliating against plaintiffs.

47.     Thereafter, pursuant to the conspiracy alleged herein, defendants commenced redirecting patients to the NYU Clinical Cancer Center ("NYUCCC") at 160 East 34th Street, New York, New York, as a new CCN-approved PET/CT scanning facility instead of sending the patients to Medscan.  NYUCCC used a different scanning machine, which was manufactured by Siemens, and produces data and scans different from the GE Discovery LS scanner at Medscan.  Therefore, patients who had previously been scanned at Medscan and had cancer, had their subsequent follow-up scans at NYUCCC producing different data and scans. This made more difficult the radiologist's interpretations when compared to the patient's prior Medscan results on the GE scanner and required conversion of data with risks of error.  Upon information and belief, there is also an adverse emotional impact on patients in changing to a new facility, particularly after several follow-up scans had been performed at Medscan. Accordingly, defendants' unlawful conduct terminating plaintiffs and requiring Medscan patients to change facilities to maintain insurance coverage destroys the continuity of Medscan patients'

14

care and treatment, adversely affects comparisons of scans needed for effective patient care, and increases patient risks and costs.

48.     Further effectuating the conspiracy to destroy plaintiffs as competitors and limit all competition in the geographic area with NYUCC and NYU radiologists approved by CCN, defendants Dr. Litt and NYU also instructed NYU physicians not to refer any cancer patients to Medscan for PET/CT scanning.  In addition, defendants went so far as to institute a policy with NYU security to refuse even to allow the delivery of Medscan scans and reports to any physician physically located within the NYU properties who had referred a cancer patient to Medscan.  This conduct has also seriously interfered with and compromised care for the cancer patients of physicians located at NYU, who cannot receive the Medscan scans and reports for their patients.

<u>**VIOLATIONS ALLEGED**</u>

<u>**FIRST CAUSE OF ACTION**</u>

49.     Plaintiffs repeat and reallege paragraphs 1 through 48 of this complaint as if set forth in full herein.

50.     In furtherance of the conspiracies and other unlawful conduct herein alleged, defendants including CCN, Litt, NYU and co-conspirators on the CCN Board and radiologists at NYU, all in competition with Dr. Kerr, agreed to eliminate Dr. Kerr as a competitor and Medscan as an approved CCN facility.  As part of that unlawful conspiracy, defendants Dr. Litt and co-conspirators arranged that CCN ceased to pre-approve or reimburse PET/CT services performed at Medscan and submitted by Dr. Kerr for covered patients.

51.     Defendants and co-conspirators thereby effectuated an unlawful group boycott of plaintiffs and terminated them as competitors by prohibiting them from participating in reimbursements for PET/CT outpatient diagnostic services to covered lives of plans under contract with CCN.

15

52.     By reason of the foregoing, commencing at least as early as January 2005 and continuing thereafter up to and including the date of the filing of this Complaint, defendants and co-conspirators have entered into contracts and engaged in a conspiracy in a per se unreasonable restraint of trade of the aforesaid interstate trade and commerce in PET/CT outpatient diagnostic services to eliminate competition in the provision of such services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

53.     The aforesaid contracts, combination, and conspiracy have consisted of a continuing agreement, understanding, concert of action, plan and course of dealing by and between the defendants and co-conspirators, the substantial terms and purposes of which have included, among other things:

a.     the restraint, elimination and suppression of competition in the provision of PET/CT services, including restraint of competition from plaintiffs Dr. Kerr and Medscan;

b.     the elimination and suppression of price competition in the provision of PET/CT services;

c.     the elimination from the market of plaintiff Dr. Kerr's and Medscan's competing services and facilities for providing PET/CT services;

d.     the fixing of prices for all CCN-approved providers;

e.     the attempted destruction of Dr. Kerr and Medscan as  competitors of defendants and defendants' facilities and the exclusion of plaintiffs from the market for PET/CT services; and

f.     the substantial foreclosure of plaintiffs and other competition from access to the market for providing PET/CT services to subscribers of major private benefit plans.

16

54.     Pursuant to and in furtherance of the unlawful contracts, combination and conspiracy alleged herein, and with the intent of effectuating same, defendants and co-conspirators have participated in the conspiracy and done those things which they combined and conspired to do, including, among other things:

a.     effectuating a group boycott of Dr. Kerr as a CCN-approved provider and of plaintiff Medscan as a CCN-approved facility, a per se violation of the Sherman Act, § 1;

b.     effectuating a horizontal agreement fixing the prices to be paid for reimbursement of PET/CT services provided to plan-covered lives, a per se violation of Sherman Act § 1;

c.     effectuating a group boycott of Dr. Kerr and Medscan knowing that CCN approval of them as providers and facilities respectively was a necessary element vital for continuation of their obtaining physician referrals to provide PET/CT services competitive with defendants' and knowing that substantial alternative patients were not readily available due to the exclusive contracts entered into by defendant CCN;

d.     effectuating an unreasonable restraint of trade by entering into multiple long-term exclusive dealing contracts with major private health benefit plans to provide PET/CT services, thereby foreclosing a substantial and dominant share of the market from competitors, including plaintiffs; and

e.     eliminating competition for PET/CT services in the relevant market and submarkets.

55.     To the extent that the aforesaid conduct, contracts, combination and conspiracies of defendants, including to horizontally fix prices among competitors and to boycott

plaintiffs as competitors, are not deemed per se violations of Sherman Act § 1, then such conduct represents and has effectuated an unreasonable restraint of trade and anticompetitive effects, by reason of defendants' market power and barriers to entry of competition.

       56.    The contracts, combination and conspiracy hereinabove alleged and the wrongful acts done pursuant thereto have had the following harmful effects, among others:

      a.    competition in the provision of PET/CT services has been suppressed and restrained;

      b.    plaintiffs have been deprived of access to provide reimbursable PET/CT services to millions of covered lives controlled by CCN through its exclusive contracts;

      c.    plaintiffs have been refused approval by CCN to provide and be reimbursed for PET/CT services;

      d.    plaintiffs have suffered injury in their relationships with patients and referring doctors because of their inability to continue to provide services which would be reimbursed by CCN for covered lives of major health benefit plans and by damage to plaintiffs' good will, reputation and impairment of plaintiffs' business and property;

      e.    plaintiffs have lost revenue and profits from existing and prospective patients;

      f.    patients and, in particular, covered lives of private health benefit plans under exclusive contracts with CCN, have been denied the benefit of a free and competitive market for obtaining PET/CT services, output of such services has been restricted and quality of patient care  has been adversely affected.

18

57.     By reason of the conduct of defendants and co-conspirators as hereinabove alleged, plaintiffs have been, and continue to be, substantially, materially and directly injured in their businesses and property in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

58.     Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.     Since at least as early as 1995, defendants and co-conspirators, with specific intent to obtain a monopoly, have combined and conspired to monopolize, and continue to monopolize, the provision of PET/CT services to patients covered by private health benefit plans, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

60.     Defendants and co-conspirators have conspired and attempted to acquire and maintain the power to control prices and to exclude competition in the provision of PET/CT services to patients covered by private health benefit plans.

61.     Defendants and co-conspirators have increased barriers to entry to competition in the provision of PET/CT services and have conspired and attempted to forestall, foreclose and limit entry into those markets by plaintiffs and other competitors and potential competitors.

62.     The purpose and specific intent of the illegal acts of defendants and co-conspirators as hereinabove alleged has been to obtain and maintain the aforesaid power to control prices and exclude competition, with the effect that defendants have achieved a monopoly or there is a dangerous probability that defendants will succeed in their purpose and achieve a monopoly.

63.     By reason of the conduct of defendants and co-conspirators hereinabove alleged, plaintiffs have been and continue to be substantially, materially and directly injured in their business and property in an amount to be determined at trial.

WHEREFORE, plaintiffs ask that the Court:

19

a.   enter judgment that defendants have engaged in conduct in violation of Sections 1 and 2 of the Sherman Act;

b.   enter judgment for plaintiffs against each defendant on the aforesaid causes of action in an amount equal to three times the amount of damages sustained by plaintiffs as a result of their being injured in their business and property by reason of defendants' violations of the Sherman and Clayton Acts;

c.   enter judgment for plaintiffs against each defendant awarding plaintiffs their reasonable attorneys fees and costs of this action;

d.   enter a permanent injunction and restraining defendants and their employees, successors, assigns and all those in active concert or participation with them from continuing the unlawful conduct herein alleged and adjudged; and

e.   enter such other and further orders and judgments as may be necessary and proper in order to dissipate the effects of the violations of law and wrongful conduct complained of herein, and to restore free competition in the provision of PET/CT outpatient diagnostic imaging services; and

       f.      ordering such other and further relief as is just and proper.

PLAINTIFFS DEMAND TRIAL BY JURY

Dated: New York, New York
       May \_\_\_, 2005

                              KAPLAN, THOMASHOWER & LANDAU LLP


                              By: s/ William Thomashower
                                   William J. Thomashower (WT-7071)

                              26 Broadway
                              New York, New York 10004
                              (212) 593-1700


                              WEISS, ZARETT & HIRSHFELD, P.C.


                              By: s/ David Zarett
                                   David Zarett (DZ-7441)

                              3333 New Hyde Park Road
                              Suite 211
                              New Hyde Park, New York 11042
                              (516) 627-7000

                              Attorneys for Plaintiffs

21