UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

NEW YORK MEDSCAN LLC and            :
KAROLYN KERR, M.D.,
                                    :

            Plaintiffs,
                                    :        **OPINION**

      - against -
                                    :    05 Civ. 4653 (DC)
NEW YORK UNIVERSITY SCHOOL OF
MEDICINE and ANDREW W. LITT, M.D., :

            Defendants.             :

- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**          KAPLAN, THOMASHOWER & LANDAU LLP
                     By:  William J. Thomashower, Esq.
                 26 Broadway, 20th Floor
                 New York, New York  10004

                          - and -

                 WEISS, ZARETT & HIRSHFELD, P.C.
                     By:  David Zarett, Esq.
                 3333 New Hyde Park Road, Suite 211
                 New Hyde Park, New York  11042
                 Attorneys for Plaintiffs

                 MCDERMOTT WILL & EMERY LLP
                     By:  Christine L. White, Esq.
                          Daniel N. Jocelyn, Esq.
                          Terri L. Ross, Esq.
                 50 Rockefeller Plaza
                 New York, New York  10020-1605
                 Attorneys for Defendants

**CHIN, D.J.**

        Plaintiffs bring this suit claiming that defendants,
providers and administrators of radiology services, violated the
antitrust laws.  Specifically, they bring this action pursuant to
Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton
Act.  15 U.S.C. §§ 1, 2, 15.

        Defendants move pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons that follow, the motion is denied.

## BACKGROUND

### A. The Facts

For purposes of this motion, the facts alleged in the complaint are assumed to be true.

#### 1. The Parties

Plaintiff Karolyn Kerr, M.D., is a radiologist, specializing in interpreting diagnostic imaging scans used to detect health conditions in the human body. Plaintiff New York Medscan, LLC ("Medscan") provides diagnostic imaging services at its office at 751 Second Avenue in New York City. Medscan has invested millions of dollars in high-technology imaging scanners, other equipment, and non-medical staff to provide patients with state-of-the-art diagnostic imaging. (Compl. ¶¶ 3, 4, 20, 22).

Defendant New York University ("NYU") School of Medicine is an administrative unit of the NYU Medical Center. (Compl. ¶ 15). Defendant Andrew W. Litt, M.D., is a professor at the NYU School of Medicine and a neuroradiologist with clinical responsibility at the NYU Medical Center and Bellevue Hospital. Litt also serves as vice-chairman of Financial Affairs of the NYU School of Medicine. (Compl. ¶¶ 13-14). Through his position at NYU, Litt obtains a direct financial benefit from providing diagnostic imaging services. Additionally, Litt is the chairman

- 2 -

of former defendant CareCore National LLC ("CCN").[1]  Litt, in his

capacity as a board member of CCN, has directly controlled and

thereby eliminated competition with NYU radiologists.  NYU and

its radiologists, including Litt, are competitors of Dr. Kerr and

have a personal stake in the unlawful acts alleged by plaintiffs.

(Compl. ¶¶ 3-4, 13-15).

## 2.    The Provision of Diagnostic Imaging Scanning Services

The newest diagnostic imaging scanning, PET/CT imaging,

integrates the technology of two diagnostic imaging techniques:

Positron Emission Tomography ("PET") and Computerized Axial

Tomography ("CAT" or "CT").  PET/CT scanning, used for diagnoses

in the area of oncology, provides the highest accuracy in

detecting abnormal tumors and identifying whether tumors are

malignant.  Physicians refer patients for PET/CT scans, which are

performed at equipped facilities such as the one operated by

Medscan.  Radiologists then interpret the scans for the referring

physicians.  PET/CT scans assist referring physicians in making

better and more informed decisions in diagnosing and treating

cancerous tumors.  (Compl. ¶¶ 17-18, 21).

When an insured patient receives a PET/CT scan, the

---

[1]     CCN and other former defendants have settled with
plaintiffs, and a stipulation of dismissal was so ordered by this
Court on November 14, 2005.  Plaintiffs expressly reserved their
claims against all non-settling defendants.  Despite the
dismissal against some of the parties to the alleged conspiracy,
assuming a claim is stated, evidence of a conspiracy and all
damages can still be pursued against the non-settling defendants.
See Zenith Radio Corp. v. Hazeltine Res., Inc., 401 U.S. 321,
342-47 (1971).

performing radiologist bills the patient's health plan for the costs of administering the scan and the radiologist's fee for interpreting the scan. The health plan will then pay most or all of these costs, either directly or through a contractual administrator such as CCN. (Compl. ¶ 21).

CCN describes itself as "the fastest growing radiology benefit management company in the county" and as "the nation's leading diagnostic imaging management company." CCN authorizes certain radiologists and facilities to provide diagnostic imaging services and facilities. CCN has entered into exclusive, long-term contracts with health benefit plans ("CCN Plans"), such as Aetna, Oxford, and HIP, to provide diagnostic imaging services to these plans' subscribers. Under these contracts, patients who are members of CCN Plans must obtain PET/CT services only through CCN-approved providers and facilities to receive reimbursement from the CCN Plans. (Compl. ¶¶ 28-30).

CCN, through its exclusive contracts with CCN Plans, controls the PET/CT services for more than 22 million subscribers, including some 3.5 million subscribers in New York City. This represents a dominant share of both the patient market and the "covered lives" market in New York City. (Compl. ¶ 33). Thus, approval by CCN is necessary for a radiologist or scanning facility to effectively compete in the New York market. (Compl. ¶ 34). By determining which facilities and radiologists CCN will authorize to provide PET/CT services, CCN and its board members, who are radiologists competing with each other and with

the radiologists and facilities they determine to authorize or refuse, effectively control the diagnostic imaging market. (Compl. ¶¶ 6, 30).

### 3. The NYU/Medscan Turnkey Agreement

Around March 1, 2002, Medscan entered into a "turnkey administrative services and license agreement" with the NYU School of Medicine (the "NYU Agreement"), signed by Litt on behalf of the NYU School of Medicine. The NYU Agreement obligated Medscan to provide office facilities, equipment, and services for NYU radiologists for a PET/CT outpatient diagnostic scanning practice at Medscan's premises for a three-year period. Under the terms of the contract, NYU could provide PET/CT scans at locations owned or leased directly by NYU, but it could not enter into a similar turnkey arrangement with any other non-affiliated NYU entity at any location in Manhattan south of 57th Street, north of Canal Street, and east of 5th Avenue, with certain exceptions. NYU was to pay Medscan $1500 per scan for use of the office space, supplies, personnel, and equipment. Around this time, Medscan was approved as a CCN-facility, enabling it to provide PET/CT scans to patients who were subscribers of CCN Plans. Also around this time, NYU obtained approval for certain NYU radiologists to be approved as CCN providers. (Compl. ¶¶ 23, 36-40).

From July 21, 2002, Kerr was employed at Beth Israel Hospital in New York City and was a CCN-approved radiologist. In November 2004, Medscan entered into a practice management

the radiologists and facilities they determine to authorize or refuse, effectively control the diagnostic imaging market. (Compl. ¶¶ 6, 30).

### 3. The NYU/Medscan Turnkey Agreement

Around March 1, 2002, Medscan entered into a "turnkey administrative services and license agreement" with the NYU School of Medicine (the "NYU Agreement"), signed by Litt on behalf of the NYU School of Medicine. The NYU Agreement obligated Medscan to provide office facilities, equipment, and services for NYU radiologists for a PET/CT outpatient diagnostic scanning practice at Medscan's premises for a three-year period. Under the terms of the contract, NYU could provide PET/CT scans at locations owned or leased directly by NYU, but it could not enter into a similar turnkey arrangement with any other non-affiliated NYU entity at any location in Manhattan south of 57th Street, north of Canal Street, and east of 5th Avenue, with certain exceptions. NYU was to pay Medscan $1500 per scan for use of the office space, supplies, personnel, and equipment. Around this time, Medscan was approved as a CCN-facility, enabling it to provide PET/CT scans to patients who were subscribers of CCN Plans. Also around this time, NYU obtained approval for certain NYU radiologists to be approved as CCN providers. (Compl. ¶¶ 23, 36-40).

From July 21, 2002, Kerr was employed at Beth Israel Hospital in New York City and was a CCN-approved radiologist. In November 2004, Medscan entered into a practice management

- 5 -

services agreement with Kerr (the "Kerr Agreement") pursuant to which Medscan would provide Kerr with office space, medical and non-medical equipment, and technicians and Kerr would read and interpret PET/CT scans taken at Medscan. The Kerr agreement was to commence at the conclusion of the NYU Agreement. Since Kerr was a CCN-approved provider and Medscan was a CCN-approved facility, plaintiffs expected services would continue to be pre-approved and paid for on behalf of the patients covered by CCN Plans. In December 2004, Kerr moved to Medscan and began reviewing scans with the knowledge and consent of Litt and NYU. (Compl. ¶¶ 42-43).

As the NYU Agreement approached its expiration, Medscan and NYU engaged in negotiations for the renewal of the NYU Agreement. During these negotiations, Litt advised Medscan that he controlled CCN and its approval process and that if Medscan did not renew the NYU Agreement or enter into a new contract with NYU on the terms it demanded, then Medscan and Kerr would lose their status as a CCN-approved facility and a CCN-approved radiologist. Specifically, Litt advised Medscan executives, in words or in substance, "I am CareCore" and asked Medscan representatives "how are you going to do this business without me?" The parties failed to enter into a new agreement. The NYU Agreement continued until its expiration on February 27, 2005. (Compl. ¶¶ 40, 44).

After the expiration of the NYU Agreement, Litt arranged for the termination of plaintiffs as a CCN-approved

- 6 -

provider and facility so as to eliminate the only viable
competition with NYU radiologists. Thereafter, CCN refused to
pre-certify patients referred to Medscan or to reimburse
plaintiffs for PET/CT services provided by Kerr at Medscan for
patients covered by CCN Plans. (Compl. ¶ 46). Defendants
instructed NYU physicians not to refer any cancer patients to
Medscan for testing and instituted a policy of refusing the
delivery of Medscan scans and reports to any physician physically
located on NYU properties, thereby interfering with and
compromising the care for the cancer patients. (Compl. ¶ 48).
Defendants began redirecting patients to the NYU Clinical Cancer
Center ("NYU-CCC"), a CCN-approved facility, which used a
different scanning device. Because of differences in equipment,
patients who had previously undergone scanning at Medscan had
their subsequent follow-up scans at NYU-CCC, resulting in
different data and scans. (Compl. ¶ 47).

## B.   This Action

On May 12, 2005, plaintiffs filed these claims against
CCN, NYU School of Medicine, Litt, both in his capacity as a
board member of CCN and in his managerial role at NYU, and
others. Specifically, the complaint alleges the following
antitrust violations: (1) By agreeing to eliminate Kerr and
Medscan as competitors, defendants engaged in an unlawful group
boycott and per se unreasonable restraint of trade and commerce
in violation of Section 1 of the Sherman Act; (2) defendants have
engaged in a course of dealing that restrains, eliminates, and

- 7 -

suppresses competition in the provision and pricing of PET/CT scans; and (3) defendants and co-conspirators have combined and conspired to monopolize, and continue to monopolize, the provision of PET/CT services to patients covered by private health benefit plans in violation of Section 2 of the Sherman Act. If the acts are not deemed per se violations, then the complaint alleges that these acts represent and have effectuated an unreasonable restraint on trade and anti-competitive effects, by reason of defendants' market power. (Compl. ¶¶ 53-55).

Plaintiffs describe, inter alia, the following injuries resulting from defendants' unlawful conduct: (1) the suppression and restraint of competition in the provision of PET/CT services; (2) patients covered by CCN Plans have been denied the benefit of a free competitive market for obtaining PET/CT services; (3) the output of PET/CT services and quality of patient care have been adversely affected; (4) plaintiffs have suffered injury in their relationships with patients and referring doctors because of their inability to provide services that will be reimbursed by CCN; (5) plaintiffs' good will and reputation have been damaged; and (6) plaintiffs have lost revenue and profits from existing and prospective patients. (Compl. ¶ 56).

This motion followed. After the filing of the motion by defendants, a stipulation of dismissal as to CCN, Litt in his capacity as a CCN board member, and certain other defendants was so ordered by this Court on November 14, 2005. Accordingly, the only claims remaining are those against the NYU School of

Medicine and Litt, except in his capacity as a board member of CCN.

## DISCUSSION

Defendants argue that the complaint should be dismissed because plaintiffs have failed to assert an antitrust injury or standing. Additionally, defendants maintain that none of the alleged acts were wrongful. First, I discuss the relevant antitrust law. I then apply the law to the facts of this case.

## A. **Applicable Law**

Section 1 of the Sherman Act declares illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits monopolies and attempts, combinations, or conspiracies to monopolize trade or commerce. 15 U.S.C. § 2. Section 4 of the Clayton Act provides a private right of action, with the recovery of treble damages, to "any person who [has been] injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15.

There is no heightened pleading requirement in antitrust cases. Twombly v. Bell Atl. Corp., 425 F.3d 99, 108-09 (2d Cir. 2005) ("We have consistently rejected the argument -- put forward by successive generations of lawyers representing clients defending against civil antitrust claims -- that antitrust complaints merit a more rigorous pleading standard."), pet. for cert. filed, 60 U.S.L.W. 3422 (U.S. Mar. 6, 2006) (No. 05-1126); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513

(2002) (declining to extend heightened pleading requirement to contexts other than fraud or mistake). Thus, "short of the extremes of 'bare bones' and 'implausibil[e]'" pleadings, an antitrust complaint "need only contain the 'short and plain statement of the claim'" required by Fed. R. Civ. P. 8(a). Twombly, 425 F.3d at 111.

To survive a motion to dismiss, an antitrust complaint must adequately (1) define the relevant market, (2) allege an antitrust injury, and (3) allege conduct in violation of the antitrust laws. Global Discount Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 704 (S.D.N.Y. 1997) (citing Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993)). Moreover, as in all cases, plaintiffs must have standing to bring an action. Daniel v. Amer. Bd. of Emergency Med., 428 F.3d 408, 436 (2d Cir. 2005). In the context of antitrust cases, however, this requirement involves more than satisfying the usual "case or controversy" requirement. Instead, antitrust standing involves a two-prong inquiry: (1) has the plaintiff asserted an antitrust injury and (2) is the plaintiff the proper plaintiff to assert the antitrust laws? Balaklaw v. Lovell, 14 F.3d 793, 797 n.9 (2d Cir. 1994) (describing two-prong analysis); see also Daniel, 428 F.3d at 443 (noting that, even where plaintiff has properly asserted antitrust injury, he may not be efficient enforcer of antitrust laws).

To allege an antitrust injury, plaintiffs must do more

than claim that they have been injured by the acts that violate the antitrust laws. Daniel, 428 F.3d at 438. Rather, plaintiffs must allege that they "have sustained an 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Id. at 438 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)); see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983) ("'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'") (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n.14 (1972)). Thus, because the antitrust laws were designed to protect competition not competitors, antitrust plaintiffs must assert harm to competition as a whole. See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 545 (2d Cir. 1993).

A plaintiff asserts harm to competition by alleging adverse effects on the price, quality, or output of the relevant good or service. Aventis Envtl. Sci. USA LP v. Scotts Co., 383 F. Supp. 2d 488, 503 (S.D.N.Y. 2005); see also Capital Imaging Assocs., P.C., 996 F.2d at 546 (holding summary judgment appropriate where plaintiffs failed to demonstrate negative effect on price or quality). Not every injury to a would-be competitor alleged to flow from anticompetitive acts will be an antitrust injury. Daniel, 428 F.3d at 438-40. Nevertheless,

where a competitor-plaintiff seeks to remove the alleged restraint on competition "so he may be 'free to compete -- such that the [competitor]'s interest coincides with the public interest in vigorous competition--' he satisfies the antitrust injury requirement." Id. at 440 (quoting Volvo N. Amer. Corp. v. Men's Int'l Prof. Tennis Council, 857 F.2d 55, 67-70 (2d Cir. 1988)).

As to the second prong of antitrust standing, the court must determine if there is some reason other than failure to allege antitrust injury that prevents plaintiff from being an efficient enforcer of the antitrust laws. Id. at 443. In making this determination, courts evaluate a variety of factors including:

> (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness of the connection between the injury and alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages.

Balaklaw, 14 F.3d at 797 n.9 (citing Associated Gen. Contractors of Cal., Inc., 459 U.S. at 537-45)).

In the context of health care antitrust litigation, courts have observed that physicians may not be the most efficient enforcer of the antitrust laws. See, e.g., Daniel, 428 F.3d at 443-44 (concluding that physician-plaintiffs seeking to join cartel were not efficient enforcers of antitrust laws);

Korshin v. Benedictine Hosp., 34 F. Supp. 2d 133, 140-41
(N.D.N.Y. 1999). Nevertheless, where a physician's interest
coincides with the patient's interest, a physician may be a
proper enforcer of the antitrust laws. See Angelico v. Lehigh
Valley Hosp., Inc., 184 F.3d 268, 274-75 (3d Cir. 1999) (holding
that plaintiff-physician was efficient enforcer of antitrust
laws); Nilavar v. Mercy Health Sys. W. Ohio, 142 F. Supp. 2d 859,
874-76 (S.D. Ohio 2000) (distinguishing Korshin and finding that
radiologist was efficient enforcer of antitrust laws); cf.
Daniel, 428 F.3d at 443-44.

## B.    Application

Defendants argue that plaintiffs have failed to meet
these standards in several respects.  First, defendants claim,
plaintiffs have failed to allege antitrust injury and do not have
standing to bring this action.  Second, they claim plaintiffs
have failed to allege any action by defendants that would
constitute an antitrust violation.  I address the arguments in
turn.

### 1.    Antitrust Injury and Standing

#### a.    Failure to Allege an Antitrust Injury

Defendants argue that plaintiffs have not adequately
alleged an antitrust injury.  (Def. Mem. at 14).  This claim
fails, for it ignores plaintiffs' allegations that defendants'
illegal conduct has harmed plaintiffs in their business and has
decreased the price, quality, and output of the provision of

- 13 -

diagnostic imaging services. Specifically, plaintiffs allege
that defendants' conduct has caused: reduced competition in the
provision of PET/CT services; reduced competition in the price of
these services; and fixed-pricing for all CCN-approved providers
(who, plaintiffs allege, make up a dominant share of the relevant
market). Such injuries are the type the antitrust laws were
designed to prevent. Further, plaintiffs have sufficiently
alleged that their claimed injuries -- harm to their goodwill and
reputation, the elimination from the market of plaintiffs'
competing services, and decreased revenue and profits -- flow
from defendants' allegedly anticompetitive conduct. Thus,
plaintiffs have adequately alleged that they have suffered an
antitrust injury.

Defendants nonetheless argue that the complaint never
identifies any market-wide injury or effect on competition as a
whole. (Id. at 3, 13). Defendants assert, for example, that
"[p]laintiffs do not allege that consumers have suffered the
consequences of reduced competition -- namely, reduced output and
higher prices." (Id. at 13). Defendants ignore, however, that
plaintiffs have alleged an impact on the price and output on the
market for PET/CT services in the New York City area. (Compl. ¶¶
28-29, 56).

Moreover, defendants omit quality from their list of
potential consequences of reduced competition. The complaint
alleges that the quality of PET/CT services has decreased as a
result of defendants' conduct because patients who had previously

- 14 -

received PET/CT scans at Medscan were forced to receive subsequent scans on different equipment. With the use of different imaging devices, the accuracy of comparisons of the scans decreases, thereby adversely affecting diagnosis and treatment. Further, by requiring patients to change facilities, the continuity of patient treatment is disturbed, resulting in an adverse emotional impact on patients. Thus, accepting the allegations as true, this is not a situation where, "[f]rom the consumers' point of view, nothing about the market has changed" as a result of defendants' conduct. Balaklaw, 14 F.3d at 798. Instead, the quality of diagnostic imaging services purportedly has decreased, and the courts have repeatedly held that a decline in quality is among the injuries that the antitrust laws were designed to prevent. See, e.g., Capital Imaging Assocs., P.C., 996 F.2d at 546; Aventis Envtl. Sci. USA LP, 383 F. Supp. 2d at 503; Nilavar, 142 F. Supp. 2d at 874. Indeed, in the context of the provision of health care services for cancer patients, the quality of care is likely to be at least as important to patients as the price. Accordingly, defendants' claim that plaintiffs have failed to allege market-wide injury is rejected.

### b. **Failure to Adequately Allege Causation**

Defendants further argue that plaintiffs have failed to demonstrate that defendants' actions, even if anticompetitive, have caused plaintiffs' injuries. Again, defendants' argument fails.

Defendants argue that, as owners and operators of

radiology facilities, they are not competitors of Medscan.
First, there is no requirement that a plaintiff be a consumer or
competitor to assert an antitrust claim. See Blue Shield of Va.
v. McCready, 457 U.S. 465, 483-84 (1982) (holding that non-
competitor's injury was an antitrust injury as it was
"inextricably intertwined with the injury the conspirators sought
to inflict"). Second, defendants' definition of the relevant
market as the "selling [of] PET/CT services to health plans"
(Reply at 6) parses the relevant market into artificially narrow
subsets and ignores the market defined in the complaint.
Plaintiffs have defined the relevant market as the provision of
PET/CT services -- a market in which defendants, plaintiffs, and
CCN all participate whether by owning or operating a PET/CT
facility or selling PET/CT services to health plans. Under this
view of the market, Medscan, CCN, Litt, and NYU are all
competitors of one another.

        Defendants further argue that Medscan's injury is only
indirectly related to the alleged unlawful conduct as they claim
any injury suffered by Medscan only occurred through the injury
to Kerr. (Reply at 5). This argument similarly fails, for the
complaint alleges that Medscan lost its status as a CCN-approved
imaging facility as a result of the anticompetitive conduct of
defendants. The loss of CCN-approval, in turn, led to lost
revenues and profits. Thus, Medscan has alleged an antitrust
injury flowing from defendants' conduct that is independent of

any injury to Kerr.[2]

As to Kerr, defendants claim that she has failed to
allege a causal relationship between her injury -- lost revenue
and profits, harm to reputation and good will, and injury to her
relationships with referring doctors -- and the conduct that had
an adverse effect on competition in the whole relevant market.
(Reply at 7). The allegations, they argue, support only a
finding that the injury caused defendants' conduct to be
anticompetitive and not that defendants' anticompetitive conduct
caused Kerr's injury. I disagree. As discussed, by alleging
that defendants' conduct has caused, inter alia, a decrease in
the quality, price, and output of health care services,
plaintiffs have alleged conduct that caused an antitrust injury.
This same conduct, plaintiffs assert, caused Kerr to suffer the
asserted injuries. Thus, plaintiffs have alleged a sufficient
causal connection between the allegedly anticompetitive conduct
and Kerr's injuries.[3]

---

[2]    I further note that, contrary to defendants' assertion
that Medscan has not alleged that it has been foreclosed from
competing (id.), plaintiffs have repeatedly alleged such harm to
both Kerr and Medscan. (See, e.g., Compl. ¶ 53 (alleging "the
elimination from the market of plaintiff Dr. Kerr's and Medscan's
competing services and facilities") (emphasis added)).

[3]    Defendants further argue that plaintiffs have
"improperly equate[d] Kerr's decreased sales with decreased
marketwide competition in the relevant market." (Reply at 8).
Of course, at trial or summary judgment, plaintiffs may not be
able to offer sufficient proof to establish an effect on
marketwide competition. Accepting the allegations as true as the
Court must on a motion to dismiss, however, plaintiffs' claim
that defendants' conduct caused both an effect on market-wide
competition and a decrease in Kerr's business following her loss
of CCN-approval is at least plausible.

- 17 -

Whether plaintiffs will be able to offer sufficient proof to establish an impact on the price, output, or quality of PET/CT scanning services or to establish a nexus between defendants' conduct and plaintiffs' injuries, they have made such allegations, which, of course, is all they are required to do on a motion to dismiss. Hence, plaintiffs have adequately pled an antitrust injury and have standing. Accordingly, the motion to dismiss is denied on this basis.[4]

## 2. **Failure to State Wrongfulness of Conduct**

Finally, defendants maintain that the complaint alleges no action by either NYU or Litt that, if true, constitutes an antitrust violation. This challenge also fails.

Pointing to allegations of actions taken after the termination of the NYU Agreement, defendants argue that NYU's conduct is as consistent with lawful conduct as it is with unlawful conduct. Again, defendants selectively refer to allegations in the complaint, ignoring the complete picture painted by plaintiffs. The complaint alleges that Litt, while acting on behalf of NYU, threatened plaintiffs during negotiations for the renewal of the NYU Agreement, "how are you

---

[4]     Defendants have not argued that plaintiffs are inefficient enforcers of the antitrust laws. Nevertheless, I note that, even if plaintiffs' primary motivations in bringing this action are to increase their own profits, to the extent they seek an injunction against the allegedly unlawful conduct and appropriate relief to restore competition in the provision of PET/CT scanning services, their interests coincide with those of the patient-consumer. Thus, at this stage in the litigation, there is no reason to conclude that plaintiffs will be inefficient enforcers of the antitrust laws.

- 18 -

going to do business without me?" and "I am CCN." (Compl. ¶ 44).
Plaintiffs claim that these statements were made with the purpose
of compelling Medscan to renew the NYU Agreement on NYU's terms.
Thereafter, Litt, acting on behalf of NYU, CCN, and himself,
arranged for CCN to terminate plaintiffs' ability to serve
patients covered by CCN Plans, thereby destroying plaintiffs as
competitors and limiting all competition in the geographic area
with NYU-CCC and NYU radiologists. (Compl. ¶ 46). "Conspiracy
is among the realm of 'plausible' possibilities" that might be
drawn from these allegations, and thus defendants' argument must
be rejected. Twombly, 425 F.3d at 114.

Defendants further maintain that "an act of pure malice
by one business competitor against another does not, without
more, state a claim under the federal antitrust laws." (Def.
Mem. at 17 (quoting Brooke Group Ltd. v. Brown v. Williamson
Tobacco Corp., 509 U.S. 209, 225 (1993)). The facts alleged,
however, present more than just malice. Rather, accepting the
allegations as true, plaintiffs present a scenario wherein Litt
attempted to use his authority as a CCN board member to bring
about a desirable contract price for NYU and, when that proved
unsuccessful, he used his position as a CCN board member to exact
revenge, thereby reducing competition. Further, contrary to
defendants' argument, it is not obvious that Litt and CCN were
incapable of conspiring, for Litt acted in various capacities --

on behalf of himself, on behalf of NYU, and on behalf of CCN.[5]
Hence, the motion to dismiss is denied on this ground as well.

Of course, whether plaintiffs will be able to survive a
motion for summary judgment is another matter. Defendants
correctly observe that "the federal courts have repeatedly
rejected, for precisely the reasons raised [by defendants], the
antitrust claims of disappointed physician competitors who were
excluded from exclusive contracting arrangements, denied
participation in managed care arrangements, or otherwise excluded
from business opportunities." (Def. Mem. at 5). These cases,
however, either were dismissed on summary judgment or involved
deficiencies in the pleadings not present here. See, e.g.,
Balaklaw, 14 F.3d at 796 (affirming summary judgment for
defendants); Capital Imaging Assocs., P.C., 996 F.2d at 545;
Ezekwo v. Am. Bd. of Internal Med., 18 F. Supp. 2d 271, 277-78
(S.D.N.Y. 1998) (deciding motions for summary judgment), aff'd,
173 F.3d 844 (2d Cir. 1999); Daniel, 428 F.3d at 443-44
(affirming dismissal where physicians sought to join cartel
rather than destroy it); Korshin v. Benedictine Hosp., 34 F.
Supp. 2d 133, 140-41 (N.D.N.Y. 1999) (granting motion to dismiss

---

[5]     Defendants claim that Litt, as a board member of CCN,
was incapable of conspiring with CCN. Where an employee or
officer has a personal interest or an interest for another
entity, however, it may be possible for that individual to
conspire with the board. See Volvo North Am. Corp. v. Men's
Int'l Tennis Corp., 85 F.2d 55 (2d Cir. 1986); Hahn v. Oregon
Physicians' Servs., 868 F.2d 1022, 1029-30 (9th Cir. 1988);
Daniel v. Am. Bd. of Emergency Med., 802 F. Supp. 912, 924
(W.D.N.Y. 1992) (discussing cases). Moreover, the complaint
alleges that Litt was acting on behalf of NYU, not on behalf of
CCN, when he threatened to terminate plaintiffs' CCN-approval.

- 20 -

where plaintiff failed to allege market-wide harm to competition). Moreover, where plaintiffs have alleged similar facts, courts have found that the complaint stated a claim and denied motions to dismiss. See, e.g., Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 274-75 (3d Cir. 1999); Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 725 F. Supp. 669, 677-78 (N.D.N.Y. 1989); Nilavar v. Mercy Health Sys. W. Ohio, 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000).

     Exclusive contracts, such as the ones at issue in this case, are an essential part of reducing prices for managed care providers, and, "[i]f analyzed from the standpoint of its effect on competition rather than its effect on competitors with whom the [managed health care] plan refuses to contract, selective and exclusive contracting should raise significant antitrust issues infrequently." ABA Section of Antitrust Law, Antitrust Health Care Handbook, 3d Ed. at 133 (2004); see also Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., Inc., 198 F.3d 246, 1999 WL 1045098, *4 (6th Cir. Nov. 10, 1999) (dismissing case involving challenge to exclusive contracting arrangement, concluding that case appeared to present challenge to the fundamental structure of the modern PPO). Nevertheless, where an exclusive contract results "in higher prices or lower quality for consumers," it may be an unreasonable restraint on competition. See Antitrust Health Care Handbook at 133. Plaintiffs have alleged a decrease in quality and output and an increase in price as a result of the exclusive contracting sufficient to survive

defendants' motion to dismiss.

## **CONCLUSION**

For the foregoing reasons, defendants' motion is
denied. The parties shall appear for a conference at 10:00 a.m.
on May 19, 2006.

SO ORDERED.

Dated:     New York, New York
           May 1, 2006

DENNY CHIN
United States District Judge